```
                 UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF FLORIDA
                    CASE NO. 06-80197-CR


    UNITED STATES OF AMERICA,

                   Plaintiff,

    vs.

    JUNG BAE KIM, and
    YUNG BAE KIM,

                   Defendants.
    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ /

                               U. S. District Court
                               301 Clematis Street
                               West Palm Beach, Florida
                               Thursday, July 17, 2008
                               3:05 - 4:34 p.m.


                 THE PROCEEDINGS BEFORE
              THE HONORABLE KENNETH L. RYSKAMP
                       -   -   -


    Appearances:

           Appearing on behalf of the Plaintiff:

              UNITED STATES ATTORNEY'S OFFICE
              BY:  STEPHEN CARLTON, ESQUIRE.
                   (561) 820-8711


           Appearing on behalf of the Defendant Jung Bae Kim:

              BY:  MICHAEL SMITH, ESQUIRE.
                   (561) 804-6859


           Appearing on behalf of the Defendant Yung Bae Kim:

              BY:  MICHAEL MALLOY, ESQUIRE.
                   (610) 565-9145
```

```
 1                   P R O C E E D I N G S

 2                        -   -   -

 3    THE COURT:  Next case is United States versus Yung Bae Kim.

 4    MR. CARLTON:  What the Government would desire is to have the

 5    corporations, then Yung Kim and then finally Jung Kim, if that's

 6    amenable to the Court.

 7    THE COURT:  Do we have different attorneys for the corporation?

 8    MR. FRIDMAN:  Yes, we do, your Honor.

 9    MALE VOICE2:  Yes, sir.

10    THE COURT:  It would look like with the corporations what we're

11    looking at is restitution and a fine.

12    MR. CARLTON:  No fine.  Just restitution and a special assessment.

13    THE COURT:  Okay.  Restitution, special assessment and probation,

14    right?

15    MR. CARLTON:  And, your Honor, since these companies are now

16    defunct, I think the Court can dispense under its discretion with

17    the probationary sentence.  There's no -- just order of

18    restitution.  Am I correct in that regard?

19    PROBATION OFFICER:  Well, that would be our mechanism for

20    monitoring the restitution.  It goes to the receiver.  By placing

21    him on probation, it's just a formality.

22    MR. FRIDMAN:  For the record, your Honor, if I may announce my

23    presence.  Dan Fridman (phonetic) from the Law Firm of Lewis Teen

24    here for the Court-appointed receiver, Guy Lewis, and on behalf of

25    the receivership entities:  Shoreland Trading LLC, KL Triangulum
```

1  Management, LLC, and KL Group, LLC.  And if the Court would permit

2  me, I'd like to make a couple of remarks that relate to the

3  sentencing issues and restitution.

4  THE COURT:  All right.  You may.

5  MR. FRIDMAN:  Thank you, your Honor.  Your Honor, the receiver, his

6  attorneys and his accountants have spent hundreds of hours pursuing

7  the recovery of assets and funds that were misappropriated or

8  misused by the officers, directors, and employees of KL.  We've

9  also fully supported and cooperated with the U.S. Attorney's Office

10  and the FBI in the criminal case.  The receiver's efforts to date

11  have resulted in the recovery of approximately 6.5 million dollars

12  from the defendants, third parties, and from the sale of KL

13  assets.  The receiver's asset recoveries include approximately $1

14  million from the sale of Juan Lee's former residence which he

15  purchased with KL investor funds, half a million dollars from the

16  sale of Jon Kim's former residence which he purchased with investor

17  funds, $47,000 from the sale of jewelry recovered from Juan Lee and

18  his fiance', and $170,000 from the sale of Jung Kim's membership at

19  the Ritz Carlton Country Club in Jupiter, Florida.

20  The receiver and the SEC also successfully petitioned this Court to

21  hold Jon Kim in contempt for defying the Court's asset freeze and

22  injunction for converting $384,000 from the sale of his vacation

23  home in South Korea, as well as converting funds he received from

24  pawning his Porsche 911.

25  In all, over 150 claims were filed by investors and third parties

1  seeking over 137 million dollars.  Each of those claims had to be

2  reviewed and reconciled against the documents provided by the

3  claimants and the KL accounting records.

4  And the receiver recently settled the last two remaining disputed

5  claims on terms favorable to the investors.

6  To date, the receiver has distributed approximately two and a half

7  million dollars to KL investors and other individuals and entities

8  with approved claims which means that the investors have received

9  about 2 or 3 cents on the dollar that they invested and lost in

10  this receivership.

11  Unfortunately, the vast majority of the funds invested in KL were

12  lost or otherwise squandered away by the KL principals.

13  In light of these facts, your Honor, the receiver acting on behalf

14  of the KL Entities agrees with U.S. Probation that the KL Entities

15  have no ability to pay the fine because all the receivership assets

16  are being used to repay the defrauded investors with approved

17  claims.

18  As far as restitution goes, we ask that the Court indicate in its

19  order that all restitution to the victims will continue to proceed

20  through the receivership and in accordance with this Court's order

21  of March 3rd, 2005, which appointed Guy Lewis as the receiver in

22  Case Number 05 Civil 80186, and this is necessary in order to avoid

23  putting the clerk's office and the probation office in the position

24  of having to repeat the work that has already been done by the

25  receiver and to avoid disruption in this process that's been

Page 5

1  ongoing for the last three years.

2  Finally, the receivership entities have paid the special assessment

3  of $400 for each of the three entities.

4  THE COURT:  All right.  Thank you.  Does anybody want to be heard

5  for the corporations, other than the receiver?

6  MALE VOICE:  No, your Honor.

7  THE COURT:  Then I'll proceed to sentencing.  I will sentence all

8  of them at one time.  Pursuant to the Sentencing Reform Act of 1984

9  it is the judgment of the Court that the defendants, KL Group, LLC,

10  Shoreland Trading, LLC, and KL Triangulum Management, LLC, are

11  hereby placed on probation for a period of four years.  While on

12  probation, the defendants shall not commit another Federal, state

13  or local crime, shall comply with the standard conditions that have

14  been adopted by this Court, and the following special condition:

15  It is ordered that the defendants pay restitution, joint and

16  several, in the amount of $78,525,567.34.  The restitution shall be

17  handled through the receiver that has been appointed in the civil

18  case.  A special assessment of $400 -- but that's already been

19  paid, you say?

20  MR. FRIDMAN:  We paid it this afternoon.

21  THE COURT:  So the total sentence is 4 years probation,

22  78,525,567.34 restitution.  And I believe that covers it.  All

23  right?

24  MR. FRIDMAN:  Yes, your Honor.

25  THE COURT:  Anything further?

1   MR. FRIDMAN:  Nothing further, your Honor.

2   THE COURT:  Now that sentencing has been imposed, do the defendants

3   or their counsel object to the Court's finding of fact or the

4   manner in which the sentence was pronounced?

5   MR. FRIDMAN:  No objection from the receiver, your Honor.

6   THE COURT:  I don't think I have to give you a caution about

7   appealing this.  So thank you.

8   MR. FRIDMAN:  Thank you, your Honor.

9   THE COURT:  All right.  We'll proceed now with Jon Kim or probably

10  Jon Kim, as he's been known as in this case.  Counsel state their

11  appearances, please.

12  MR. CARLTON:  For the United States, Assistant U.S. Attorney, Steve

13  Carlton and Edward Nucci.

14  MR. SMITH:  Good afternoon, your Honor.  Mike Smith on behalf of

15  Jon Kim who is present before the Court for imposition of sentence.

16  THE COURT:  You've reviewed the presentence report with your

17  client.  Are there any objections?

18  MR. SMITH:  Judge, we have filed objections regarding --

19  THE COURT:  I thought you did, but I've got to find them.

20  MR. SMITH:  It's docket entry 145.

21  THE COURT:  Yeah, I have them right here.  Have any of those

22  objections been resolved?

23  MR. SMITH:  Judge, we haven't resolved the -- really, the one

24  objection is the sophisticated means enhancement.  I'm not going to

25  argue to the Court.  I set it forth in my document.  The

1  prosecutors responded.  So unless the Court wants to hear further

2  argument.

3  THE COURT:  I read your objection and the prosecutor's response.

4  And they cited extensively from similar cases.  And it would be my

5  opinion that this was a very sophisticated means.  This would

6  certainly qualify for an enhancement on that ground.  So I'll deny

7  your objection on that ground.

8  MR. SMITH:  I also had filed factual objections that really don't

9  affect the guideline computation.  And rather than put on a lengthy

10 sentencing proceeding and submitting factual arguing facts, I would

11 ask if the Court would consider just appending this objection

12 document to the PSI because it simply sets forth the defendant's

13 position.  And I know the PSI ordinarily sets forth the

14 Government's position on certain facts.

15 THE COURT:  We can do that.

16 MR. CARLTON:  We have no objection to that procedure.

17 MR. SMITH:  I appreciate that, Judge.

18 THE COURT:  Any further allocution?

19 MR. SMITH:  Yes, your Honor, I do.  That was my objections.  May I

20 approach?

21 THE COURT:  Certainly.

22 MR. SMITH:  Thank you.  First, I want to let the Court know that

23 the comments that I have are my comments based on what I know about

24 the case and my relationship with Mr. Kim.  And Jon would like to

25 address the Court personally when I'm finished.  He has some

1    comments he would like your Honor to consider also.

2    The first thing I want to ask the Court to consider is this is not

3    like your ordinary white collar fraud case where you get a bunch of

4    principals together and they set out to fleece people, and they

5    literally sell their product to low-level, unsophisticated people

6    that really can't afford investments, and then they simply take

7    their investments; they put it in their pocket.  They steal it, and

8    they live high on the hog.  This is not what this case was about.

9    Number 1, this was a hedge fund.  And as a hedge fund, obviously,

10   there were substantial risks associated with any investment that

11   any investment investor would put in.  And as a hedge fund, the

12   investors were sophisticated and well-financed investors.  Again,

13   as opposed to the ordinary case where you might have a Ponzi

14   scheme, a flimflam, when you're selling some kind of vitamin.  And

15   grandma gives her last 35 cents she saved in order to get the

16   vitamin to save her life.  It's meaningless.  The vitamins aren't

17   sold.  They are not produced.  And the principals put the money in

18   their pocket.  That was not what this was all about.  I don't mean

19   to suggest that it's any better to take money from the wealthy than

20   from the not so lucky, but that's what this case was about.

21   THE COURT:  It kind of reminds me in the thirties when the bank

22   robbers were robbing banks.  And they said, Why are you doing it?

23   And they said, That's where the money is.  And hedge funds only

24   appeal to people with substantial assets.  Other people don't

25   qualify.  So this whole scheme is directed to where the money is;

1   right?

2   MR. SMITH:  Well, that's true, Judge.  But the investors were also

3   of a sophisticated nature where they were well aware of the

4   substantial risks that were taken by investing money in a hedge

5   fund.

6   THE COURT:  They weren't taking a risk that they were going to put

7   the money in a pocket and create fraudulent statements that

8   deceived the people as to what was happening with their money.

9   MR. SMITH:  Well, Judge, absolutely.  Jon pled guilty to deceiving

10  the people.  But I think what the gravamen of the offense was, at

11  least as I understand it and is able to grasp it, is that there

12  were, in fact, numerous trades.  It wasn't simply just stealing the

13  money and not doing anything.  There were trades.  But I think what

14  the gravamen of the defense is that KL was able to take, and

15  Mr. Kim was able to take, management or commission fees based on

16  trades.  Here, what they did is got in a situation where they were

17  upside down where trades were made and they were losing tons of

18  money, but enable I think to keep the investors in and perhaps to

19  entice more investors to come in, that's when the false statements,

20  the proclomations, the announcements, the bragadootchie about

21  success is made in different trades came out.

22  Again, I think what it was is that they were claiming success in

23  trades that they weren't making -- they were losing money.  But the

24  purpose was to keep investors and also to take down their

25  management fees.

1   THE COURT:  Of course, they were also taking the money they should

2   have been investing and buying homes and cars and lavish offices

3   and things of that nature, right?

4   MR. SMITH:  That did occur, Judge.  But on a relatively -- when you

5   compare it to a $200,000 from investments, I think -- and I sat

6   down with the prosecutor --

7   THE COURT:  200 million.

8   MR. SMITH:  200 million, I'm sorry.

9   THE COURT:  It's a million here, a million, and pretty soon you're

10  talking about real money, huh?

11  MR. SMITH:  Judge, that's true.  But what I wanted to point the

12  Court to is in talking to Mr. Carlton, it seemed to me as far as

13  the personal take, the personal loss, the benefit to Mr. Jon Kim

14  probably 8 to 10 million dollars which is a tremendous amount of

15  money, absolutely.  But it's not your typical white collar case

16  where you take in 200 million and you spend 300 million and

17  everybody is left holding the bag.

18  And again, I don't think they just took investors money and put it

19  in their pocket.  There actually were trades.  They just weren't

20  successful in the trades.  And then they lied to the investors

21  about how successful they could be.  For instance, the REM trade

22  which didn't occur so they could keep the money and get more

23  investors coming in.  I'm asking the Court to take some factors in

24  to consider when imposing a sentence.  And certainly the sentence

25  should be one that's sufficient but not greater than necessary.

1  So number 1, I want the Court to consider the fact that really this

2  wasn't your typical scam where the little lady across the street

3  and the grandmother lost everything to somebody.  That's not the

4  case in this situation.

5  Second of all, by Jon Kim pleading guilty, I believe he saved this

6  Court and conserved considerable court time and resources with his

7  plea.  I know the Government thought it would be perhaps a six-week

8  trial.  I'm thinking it was more like a two-month trial.  The

9  Government had close to 75 witnesses lined up:  12 investors,

10  expert accountants, expert FBI agents, forensic accountants,

11  trading and banking experts, stock and securities experts,

12  et cetera.  And by Jon Kim pleading guilty I think he conserved a

13  considerable amount of judicial resources, not just in time but

14  government expenses also.

15  THE COURT:  He got credit for that, didn't he, for acceptance of

16  responsibility?

17  MR. SMITH:  Well, we'll get to that in a minute, Judge.  I'm not

18  really sure he did.  That's one of the arguments I'm going to make

19  to your Honor.  The third thing I want the Court to consider as a

20  factor in imposing what I believe should be a sufficient but not

21  greater than sentence would be the fact that Jon Kim has, in fact,

22  cooperated with the prosecution and continues to cooperate with the

23  prosecution in hopefully wrapping up this entire part of his life

24  in the KL Group.  And when I say he cooperates, he has been at the

25  Government's leisure to speak with them and has spent hours and

1   hours speaking with them, going over documents and discussing

2   perhaps other participants' rolls in the downfall of KL.  So I

3   would ask the Court to consider that.  They are not in a position

4   now to file a 5K.  But I think the Court can consider since the

5   moment he pled and even weeks before that Jon has sat at the table

6   with the prosecution and tried to answer everything he can and to

7   give as much information he can to tie this totally up.

8   A fourth thing the Court could consider is the fact that Jon Kim

9   did not run, and he's obviously not a fugitive.

10  My understanding is KL really started to fall apart around March of

11  '05.  Jon was arrested in November '06.  And in that 18-month

12  period, I think others in this case decided they would flee.  Jon

13  did not.

14  The fifth thing I want the Court to consider is the loss amount.

15  Now, he is looking at, under the guidelines, an excess of 20 years

16  which is the statutory max.  And this is for receiving the unearned

17  commissions and the management fees.  But I believe a 20-year

18  sentence in this situation is excessive and overrepresents his

19  actual criminal conduct.

20  Again, I explained to the Court earlier the type of investment this

21  was.  Sophisticated people and although the $200,000,000 is the

22  lost figure for guidelines purposes, I think the true loss or, at

23  least, the true amount that was pocketed by Jon Kim is

24  significantly less, perhaps 5 to 10 percent of that, which really

25  would have been the misappropriated funds that he benefitted from.

1   So I think the guidelines really overrepresent.  And it's

2   calculated on the investments and the investors' money but not

3   actually the amount that Jon put in his pocket.

4   The sixth thing I want the Court to consider is by pleading guilty

5   Jon Kim conserved not only the Court and the government assets but

6   certainly an incredible amount of the CJAA budget.  I went over

7   this with an investigator.  And we had all kinds of experts lined

8   up:  Computer people that could download.  We had hard drives, soft

9   drives, u-drive, i-drive, everything in the world.  I have 88

10  banker boxes full of documents that I've had to go out and rent a

11  warehouse just to store it in.  And that's just the discovery in

12  this case.

13  The investigative fees were estimated to be in excess of $200,000.

14  That doesn't include what might have been forensic accountant fees

15  and various computer analysts and specialists.  And I know for a

16  fact that when you take all of the fees together as well as the

17  attorney fees for representation in a case like this, you are

18  talking of hundreds and hundreds of thousands of dollars of

19  taxpayers' money to defend this case.  Jon Kim elected not to

20  proceed with investigating and interviewing over 50 witnesses, many

21  of whom lived across seas.  I certainly didn't request funds from

22  the Court to go do that.  The investigators -- we put a halt on the

23  investigation when Jon and I and the Government started really

24  discussing how we could resolve this case back in March of this

25  year.  So in a case where there's 35 counts and a

1   200-million-dollar misappropriation of funds, I want the Court to

2   consider the true savings to the taxpayer, to the Court, and

3   certainly to the CJAA budget funds of literally hundreds and

4   hundreds of thousands of dollars by resolving this with a plea.

5   The seventh thing I want the Court to consider is Jon, his family,

6   and the Information and the PSI.  Jon is 40 years old.  He's a

7   naturalized United States citizen with absolutely no prior record,

8   not a single blemish in his record.  He's been with the same woman

9   for over 22 years.  And they have two beautiful children together,

10  his son Joshua who is 14 and his daughter Leyah, who is 4 years

11  old.  Jon will discuss with your Honor some things that he has in

12  his mind and what he's learned over the last couple years while

13  he's been in jail.  You know, this is a case where it's almost --

14  the amount of money becomes staggering, and it becomes

15  intoxicating.  And I think it removes somebody from the reality of

16  what's really important in life.  And I know Jon has had a chance

17  to really think about that.  And he will address the Court further

18  on his own behalf.

19  Lastly, the Court had mentioned, and I'm glad you recognize this,

20  your Honor, about whether or not he already gets a benefit for

21  acceptance of responsibility.  As the Court is aware, when the

22  statutory maximum sentence is less than the guideline sentence, and

23  the statutory maximum is twenty years, the guidelines -- and I

24  don't have my thing here.  But it's substantially higher than that,

25  at least as estimated and computed by the probation office.  But

1   there is the recommendation from the Sentencing Commission that

2   says, When the guidelines are higher than the statutory maximum,

3   just give him the statutory maximum.

4   Well, back in the old days when they were mandatory guidelines and

5   the Court had to file the guidelines, that's what the law was.  But

6   even back then, the Court may recall the case of United States

7   versus Rodriguez, found at 64 Fed. 3rd 638, an 11th Circuit case in

8   1995 which back then, even the 11th Circuit recognized that in a

9   situation where the statutory limit is less than the guidelines,

10  simply to give the guy a statutory limit sentence does not reflect

11  anything for his plea of guilty, and simply does not render the

12  defendant's acceptance of responsibility or, as the Court said,

13  this may render the defendant's acceptance of responsibility

14  meaningless because the 2- or 3-point reduction that ordinarily

15  would come, and in this case a 3-point reduction for pleading, is

16  wiped out.  So I'm asking the Court to consider that along with the

17  other 7 factors that I had in imposing a sufficient but not greater

18  than necessary sentence.  And I don't believe that the statutory

19  maximum 20-year sentence on a 40-year-old first offender for this

20  type of offense is really a reasonable and appropriate sentence,

21  Judge, not given the other factors that I've argued and certainly

22  relying on that Rodriguez case that this Court has discretion to at

23  least accord him something downward from the statutory maximum for

24  having pled guilty and saving the hundreds and thousands of dollars

25  and certainly the Court time.

1  THE COURT:  You mentioned a bunch of factors there.  There's a

2  factor that kind of stands out in my mind yet is that he was under

3  a definite freeze order not to sell assets.  And he sold those

4  assets in spite of this Court's order in the civil case.  And I put

5  him in jail for violating that order.  And he well knew that he

6  couldn't do that.  And he tried to sneak some assets through to

7  avoid the receivership.

8  MR. SMITH:  Judge, Mr. Kim is going to address that.  And certainly

9  the Court can consider that.  And the Court has considered it and

10  put him in jail and held him in contempt for it.  Mr. Kim will

11  address that.  But I don't think that he should be double-penalized

12  for it on the criminal side for a sentence when, in fact, he

13  already was taken off the street and put in jail in a civil

14  contempt situation.

15  THE COURT:  Well, you're saying he has a perfect record, and he's

16  never had any problems before.  And, of course, this problem came

17  out of this very same thing.  But it shows the total lack of

18  respect for the orders of this Court.

19  MR. SMITH:  I think it does to an extent, Judge.  And Mr. Kim will

20  address it.  But I also think it shows a certain -- beyond

21  confidence, maybe arrogance that I think Mr. Jon, in his existence

22  back then, was under.  I really firmly believe he thought he could

23  use the money to invest the money to make money, perhaps to set his

24  family aside when he goes to jail or perhaps to help the receivers

25  in getting some moneys.  He will address that.  And I think the

1   Court will be interested to hear what he has to say.  I'm asking

2   the Court to impose a sentence but considering that he should get

3   some downward adjustment from the 20 years for pleading guilty and

4   for the other seven factors I've pointed out.  He's been in jail

5   since November of '06.  And I believe the Government -- I don't

6   know that they'll join in my recommendation.  Certainly, they are

7   not going to oppose my recommendation that he get credit for the

8   time he's been in jail since November of '06.

9   THE COURT:  That's not up to me.  That's a given in the system.

10  MR. SMITH:  Well, I think he was in jail from November of '06.  The

11  indictment came down December.

12  THE COURT:  But you're saying he's in jail for the contempt rather

13  than for this offense.  I see.

14  MR. SMITH:  I'm asking the Court also -- and I believe the

15  prosecution has indicated to me that the SEC case, the contempt

16  case, is going to be discharged with the sentence here and with the

17  restitution orders that your Honor imposes.  Jon has shown

18  atonement for his misconduct.  He's beginning to start his life

19  anew.  He's been totally humbled.  Your Honor is aware of the type

20  of lifestyle he has.  And for the last two years he stands on line

21  waiting for a handout of a baloney sandwich.  I think it's really

22  changed the man and made him realize what's important in life is

23  not how many shekels you can collect and put in your pocket and

24  what kind of car you drive.  But the really important things, your

25  family, your loved ones, other members of society, your health and

1    things of that matter.  I have more to ask the Court in a

2    recommendation phase.  But that's all I have to ask the Court at

3    this point to consider when imposing a sentence.  And I know that

4    Jon would like, your Honor, if you could, to spend some time to

5    listen to what Jon has to say.  Thank you.

6    COURT REPORTER:  Your Honor, could I have a minute to change my

7    paper?

8    THE COURT:  All right.  She's going to take a minute to change her

9    paper.

10         (The court reporter changed her paper.)

11   THE COURT:  Go ahead.

12   JUNG BAE KIM:  Good afternoon, your Honor.  I want to first thank

13   you for allowing me this opportunity to address this Court.  And,

14   obviously, in the last statement -- your Honor, when I breached the

15   contempt order, it was not to outright disrespect you or this Court

16   or the Government in this case.  It was a state of mind where, in

17   all sense, you have a situation where people around you are gone.

18   And when the house of cards fall, you try desperately in your own

19   will to make amends by showing an ability to bring together and

20   make up a loss that, in reality, you can never do it.

21   Mathematically, it was not possible.  But the desperation at the

22   time forces a person to do certain acts that normally one would not

23   do.  But at that time, your Honor, it was not to disrespect

24   your Honor.

25   And I recall back in October of 2006 where during a deposition

```
 1   hearing you mentioned my actions, that I was blatant and that I had
 2   total, complete disregard for the Government and the law.  My
 3   actions may come across that way.  But by all means, your Honor, it
 4   was not my intentions to do so.  And I sincerely ask for
 5   forgiveness for doing what I did in that act of disobeying your
 6   orders.  And the punishment I have endured these past two years of
 7   incarceration has taught me an invaluable lesson, your Honor.  And
 8   it has not --
 9   The days that I have been incarcerated, your words from that
10   deposition has stuck with me for a very long time.  And I just want
11   you to know that's not something that I just whimmed off and
12   forgot.  It's something I did.  I recall even to today when we were
13   on the phone and your comments towards me, and it did have an
14   everlasting effect on how to, for me, as a person to accept
15   responsibility moving forward.
16   Also, your Honor, on April 7th of this year the Government and I
17   came together in a plea agreement to come to be charged to one
18   count of wire fraud.  Your Honor, despite the best of intentions I
19   had, I made an unacceptable error in judgment committing the crime
20   of which I am guilty of.
21   Your Honor, today I accept accountability and responsibility for my
22   crimes.  I could not be more ashamed.  And I am sincerely
23   apologizing to all of the investors, my wife, my daughter and,
24   particularly, to my son for those crimes.
25   Your Honor, I deeply regret my conduct.  And this experience will
```

1   alone be -- leave a permanent scar that I would endure forever in

2   my life.  Wisdom of 20-20 hindsight teaches us to learn from our

3   mistakes.  I chose a darker route which injured many innocent

4   people.  The destruction and suffering upon my own family and loved

5   ones will forever be a reminder, a memory, which will forever haunt

6   me for the rest of my life.  During my time of incarceration has

7   taught me humility and to humble myself before God and to this

8   great country of ours.

9   Your Honor, my wife told me a few months ago my daughter, while she

10  was in school, to another child, that my daddy is in jail.  And

11  this young child responded back and said, That's not true because

12  daddies do the right things; only evil people go to jail.

13  At the time of hearing this news, the unbearable shame made me

14  realize my failure as a husband, as a father and as a man.

15  Your Honor, I once felt I had the world, as I knew it, within my

16  grasp.  I have come to realize how delusional I have been in my

17  sense of accomplishments.  My greed fueled downward spiral

18  destroying everything in its path.  At times I felt destitute,

19  alone, afraid and completely lost.

20  My time spent with individuals with crimes varying from murder,

21  violent crimes and drug-related offenses have taught me a deeper

22  understanding and purpose in life.  I'm a believer:  Those who

23  choose to ignore history are doomed to repeat their mistakes and,

24  ultimately, lead to one's own demise to selfdestruction.

25  I have accepted my shortcomings for my crimes as a complete failure

1   and a disgrace.

2   In the process of helping young men to overcome a life of drugs and

3   crime, that has motivated me to face and overcome my failures.

4   This experience has made me realize life is no longer about me,

5   money or power.  Life is about others and to leave a positive

6   imprint in people's lives.  I stand before your Honor.  I am not

7   the same man two years ago.  I wish to pay my debt to society in a

8   manner befitting my crime.  If your Honor feels prison is the only

9   and best means to atone for my crime, I fatefully accept my time.

10  And I go on to reform from my past ways.

11  I am at your mercy.  I know I'm looking at 20 years.  And I hope

12  that I will receive some leniency in any shape or form if I am

13  deserving of that.  At this time I would like to thank the

14  Government, Mr. Carlton and Mr. Nucci for allowing me to atone for

15  my mistakes.  I also would like to thank this Court for bringing

16  Mr. Smith to my case and helping me, not only in the case but also

17  as a person.

18  Also, your Honor, finally, I never had an opportunity to handle my

19  personal affairs with my wife for my wife and my kids.  And if it

20  is possible, I am requesting the time of 90 days to be able to do

21  that.  I thank you for your time, your Honor.

22  THE COURT:  Thank you.  I'll hear from the Government.

23  MR. CARLTON:  Your Honor, I agree with some of the things, not all

24  of them certainly, but some of the things that Mr. Smith raised.

25  It is important for the Court to recognize that the advisory

 1  guideline range in this case is I believe 292.  It's an offense

 2  level of 40 with criminal history category 1.  And the advisory

 3  range is 292 to 365.  As the Court is aware, the defendant pled

 4  guilty to a single count of wire fraud which carries a statutory

 5  cap of 20 years.  So the sentence cannot be more than 20 years.

 6  And, certainly, the argument raised by Mr. Smith is one that has

 7  some logic to it.  But the Court needs to be aware that certainly

 8  that factor with regard to the amount of money that was involved,

 9  the number of victims, the likelihood of an aggravating role

10  adjustment and all of those things were to some extent known by the

11  Government, and to some extent the defendant received a benefit

12  with regard to the limitation of the plea to one count, but that

13  the Court does have discretion to factor in some downward

14  adjustment.  And we don't quibble with that.

15  It should be noted importantly that in the context of the evolution

16  of this case that initially the Government insisted on a plea to

17  two counts with the cooperator, the defendants's younger brother,

18  Yung Kim, and that Yung Kim statutorily actually faces 25 years.

19  And this defendant was allowed to plead because circumstances often

20  change with regard to the Government's obligations on other

21  pressing matters and for other factors.  But this defendant got a

22  substantial break with regard to the Government allowing him to

23  plead only to one count.

24  We do agree that this is a case that was not a pure theft case.  It

25  was a case, by and large, that did involve investors who were

1  sophisticated, investors of substantial means, and that unlike a

2  typical Ponzi which is outright theft, that the theft here was

3  lying about the trading that was going on and then taking

4  performance fees that they simply were not entitled to.  And a

5  significant way in which they accomplished that was through the use

6  of fairly sophisticated means of concealment, providing counterfeit

7  documents to an attorney who then invested and brought in a large

8  number of investors, implementing a Web site that carried forward

9  the counterfeit documents or the counterfeit returns and providing

10  counterfeit documents to actual accountants that were hired by

11  questioning investors at the end of the day.

12  There is no question that Mr. Kim's plea did save the Government a

13  substantial amount of time and resources, both the Government and

14  the Court.  The Court has discretion to factor in all of this.  And

15  in fashioning a sentencing, we do recommend that the Court at

16  whatever guideline range it decides to impose sentence, we do

17  recommend the lower end.  We recognize that the existing guideline

18  range of 292 to 365 is substantially fashioned to assure that a

19  sentence is sufficient to not only punish this defendant but to

20  serve as a deterrence in the securities industry that for those

21  persons who might think about starting a hedge fund or

22  participating in a fraud on the marketplace that there is a very

23  significant risk to doing that.  For that reason, deterrence is an

24  incredibly important factor in prosecuting these types of cases.

25  Thank you.

1    THE COURT:  You said that you allowed a plea to one count which

2    limited the sentence well below the guideline.  I don't imagine --

3    or you can answer me.  You never had any problem proving this

4    case?  It would just take time.  But it seemed like this way you

5    had a lock on this case, didn't you?

6    MR. CARLTON:  We do believe that we were confident we were going to

7    achieve a guilty resolution across the board; that is correct, your

8    Honor.  Those cases take a substantial amount of resources with

9    regard to the Court's time and the Government's time and resources

10   not only with personnel but also the Court and actually the cost of

11   producing a trial.  We factored all of that in.  Our decision to

12   allow a plea to one count substantially rested on that and

13   certainly had nothing to do with the confidence of the Government

14   in its case.

15   THE COURT:  Well, you weren't giving up anything but cost and time,

16   right?

17   MR. CARLTON:  I believe that that's true, your Honor.

18   THE COURT:  All right.  There may be some investors present here.

19   And if so, some may wish to speak at this point.  I'll hear from

20   any investors who would care to be heard.

21   All right.  Anything further, Mr. Smith?

22   MR. SMITH:  No, your Honor.  But we would ask the Court to consider

23   that Rodriguez case and to factor in something for the plea.  I

24   have nothing further.  I do have some requests once your Honor does

25   impose sentence.

1  THE COURT:  There's always a problem when you have such a massive

2  fraud like this that it's expensive to prosecute and costs the

3  taxpayers for the prosecution, the defense for the expert

4  witnesses, to pay the jurors.  And it's not as though he was giving

5  up any parts of a weak case or a weak claim.  It just is expensive

6  to try.  And there's been plenty of loss to the investors already

7  in this case.

8  And furthermore, because of the statutory limitation, I guess

9  Congress couldn't conceive of a case that any kind of fraud case

10  that could exceed 20 years, yet when you look, you plug into the

11  guidelines, you're looking at 295 to -- 292 to 365 I believe.  So

12  he's already received a substantial reduction by the Government

13  allowing him to plead to just one count whereas if there were other

14  counts, they could run consecutive and wouldn't be held by the

15  statute of limitation or the statute of -- the limitation under the

16  statute.

17  However, I do believe that some consideration should be given for

18  his plea.  And I will make a slight adjustment from that.  The

19  Court has considered the statements of all parties, the presentence

20  report which contains the advisory guidelines and the statutory

21  factors.  It is the finding of the Court that the defendant is not

22  able to pay a fine as well as restitution.  It's the judgment of

23  the Court that the defendant, Jung Bae Kim is hereby committed to

24  the Bureau of Prisons to be imprisoned for 220 months.  It is

25  further ordered that defendant shall pay restitution, joint and

1  several, with all defendants -- codefendants in the amount of

2  $78,525,567.34 less any amount already disbursed to the investors

3  in Docket Number 05-80186-Civil-Ryskamp.

4  During the period of incarceration payments shall be made as

5  follows:  If the defendant earns wages in a Federal Prison

6  Industries job, then defendant must pay 50 percent of wages earned

7  toward the financial obligations imposed by this judgement in a

8  criminal case.

9  Secondly, if the defendant does not work in a Unicorp job, then the

10 defendant must pay a minimum of 25 dollars per quarter toward the

11 financial obligations imposed in this order.

12 Upon release from incarceration, the defendant shall pay

13 restitution at the rate of 10 percent of monthly gross earnings

14 until such time as the Court may alter that payment schedule in the

15 interest of justice.  U.S. Bureau of Prisons, U.S. Probation

16 Office, U.S. Attorney's Office shall monitor the payment of

17 restitution and report to the Court any material change in

18 defendant's ability to pay.  These payments do not preclude the

19 Government from using any other anticipated or unexpected financial

20 gains, assets or income of the defendant to satisfy the restitution

21 obligation.  The restitution shall be made payable to the Clerk in

22 the United States Courts and forwarded to the U.S. Clerk's Office,

23 attention:  Financial Section, 400 North Miami Avenue, Room -- this

24 must be a misprint here.  What room is this?  It's not 8-N-09.

25 PROBATION OFFICER:  Yes, it is.

1   THE COURT:  What did they do?  Renumber the rooms there.

2   PROBATION OFFICER:  Yes, they moved into a new building.  But,

3   your Honor, all this restitution should go through the receiver

4   because of your decision in the last case.

5   THE COURT:  That's right.  It should all go through the receiver.

6   So ignore that part about paying through the Clerk's Office.

7   While on supervised release the defendant shall not commit any

8   crimes, shall be prohibited from possessing a firearm or other

9   dangerous device, shall not possess a controlled substance and

10  shall comply with the standard conditions of supervised release,

11  including the following special conditions:

12  Defendant shall cooperate fully with the Internal Revenue Service

13  in determining and paying any tax liabilities as a result of this

14  offense.

15  Further ordered that defendant file accurate income tax returns,

16  pay all taxes, interest and penalties due and owing by him to the

17  Internal Revenue Service.

18  Defendant shall provide complete access to financial information,

19  including disclosure of all business and personal finances to the

20  U.S. Probation Officer.

21  Defendant shall not apply for or solicit or incur any further debt

22  including but not limited to loans, lines of credit or credit card

23  charges either as a principal or a co-signer, as an individual or

24  through any corporate entity without first obtaining written

25  permission from the Court.

1  Defendant shall maintain full-time legitimate employment and not be

2  unemployed for a term of more than 30 days unless excused for

3  schooling, training or other acceptable reason.

4  Further, defendant shall provide documentation including but not

5  limited to pay stubs, contractual agreements, W-2 wage and earning

6  statements and other documentation requested by the U.S. Probation

7  Officer.

8  Defendant shall obtain prior written approval from the Court before

9  entering into any self-employment.  Defendant shall submit to a

10  search of his person or property conducted at a reasonable time and

11  in a reasonable manner at reasonable times by the U.S. Probation

12  Officer.

13  Defendant shall immediately pay the United States a special

14  assessment of $100.

15  Now that sentence has been imposed, does defendant or his counsel

16  object to the Court's finding of fact or the manner in which the

17  sentence was imposed?

18  MR. SMITH:  No, your Honor.

19  THE COURT:  You have a right to appeal the sentence imposed.  Any

20  notice of appeal must be filed within 10 days after the entry of

21  judgment.  If you are unable to pay the costs of an appeal, you may

22  apply for leave to appeal without payment of costs.  Do you

23  understand that?

24  JUNG BAE KIM:  Yes, your Honor.

25  THE COURT:  Anything further?

1    MR. CARLTON:  Your Honor, was there a three-year period of

2    supervised release imposed as part of the sentence?  I didn't make

3    a note.  If you mentioned it, I missed it.

4    THE COURT:  I don't even see that in here.

5    COURT CLERK:  No.

6    THE COURT:  It's here.

7    PROBATION OFFICER:  It's at the end of the restitution.

8    THE COURT:  I imposed conditions of supervised release, but it

9    would be a three-year period of supervised release and the general

10   conditions and special conditions.

11   MR. SMITH:  Judge, the only other request defense would have is,

12   number 1, I would ask the Court in its judgment and commitment

13   order to recommend credit for the time that he's been in jail since

14   November of '06.  I urge the Court to do that.  And I also ask the

15   Court to recommend a level 1 secure facility, perhaps in Eglin,

16   Florida, or Pensacola, as well as to recommend it appears in the

17   PSI that Jon had an alcohol abuse problem.  And if the Court could

18   recommend the 500 hour ADAP program while incarcerated.

19   THE COURT:  What's the Government say?

20   MR. CARLTON:  No objections to all of those.

21   THE COURT:  I'll recommend either Eglin or Pensacola and

22   the 500-hour drug program.

23   MR. SMITH:  And also the credits, Judge, so that I don't have to --

24   THE COURT:  I'll give him credit for that time.  It seemed it came

25   right out of the same offense.

1    MR. SMITH:  Thank you very much, Judge.  And have a good day.

2    MR. CARLTON:  Thank you, your Honor.

3    MR. SMITH:  Judge, before the defendant's removed, I think there

4    was a request -- I assume by your Honor's order it was denied -- to

5    have 90 days for him to get his house in order.

6    THE COURT:  Denied.

7    MR. SMITH:  Thank you.

8    (The proceedings were adjourned at 3:55 p.m.)

9    THE COURT:  The United States versus Yung Bae Kim.

10   MR. CARLTON:  Steve Carlton and Edward Nucci are for the United

11   States.

12   MR. MALOY:  Michael Maloy on behalf of Mr. Kim, your Honor.

13   THE COURT:  You reviewed the presentence report.

14   MR. MALOY:  I have, your Honor.

15   THE COURT:  And you filed some objections.  Have any of these been

16   resolved?

17   MR. MALOY:  No, your Honor.

18   THE COURT:  You may proceed with that.

19   MR. MALOY:  Just briefly, your Honor.  It's on the downward

20   departure for the minor participant.  To reiterate, I think some

21   factors that need to be highlighted, that is while this was, in

22   essence, a four-year fraud, that Yung Kim's participation was

23   really in the last 11 months.  And even if he was employed prior to

24   that time by the investment company, he didn't even have knowledge

25   of the fraud.  He did become aware of it; and, unfortunately for

1   him, participated in at the end of the fraud.  He at no time had

2   any access to the bank accounts.  He at no time was eliciting

3   clients.  And I think in addition to the other factors that I set

4   forth in the motion and in the memorandum, another factor I think

5   the evidence is his level of participation is you heard the

6   receiver earlier this afternoon indicate the financial benefits

7   that were received by Juan Lee and Jon Kim, how they got hold of

8   the country club membership and the Porsche.  None of that is

9   mentioned to Yung Kim.  He was an employee.  And he was a salaried

10  employee.  So while he did participate at the end of this fraud in

11  creating certain documents and assisting and creating certain

12  documents, that he certainly was nowhere near the level of the

13  participation as to the other two individuals involved.  And he

14  clearly meets the definition of a minor participant.

15  Secondly, your Honor, as to the criminal history, again I would

16  suggest that the memorandum speaks for itself.  But as evidenced in

17  the presentence report, Mr. Kim has an alcohol problem.  He has had

18  an alcohol problem.  Unfortunately for him, he did have a DUI.  And

19  that is that DUI that caused him to be on probation while he then

20  became employed in his brother's company and then somewhere along

21  the line participated in the fraud.  So technically he was

22  committing the fraud while on probation.  And, technically, he

23  certainly was given that adjustment.  But I would suggest and only

24  suggest that that record of the DUI and his overall criminal

25  history prior to that, which is zero, and the rest of his personal

1    life as reflected in the presentence report, certainly suggests

2    that that adjustment over emphasis his criminal history, and it

3    should be reduced to a criminal history of 1.

4    THE COURT:  All right.  What does the Government say on the

5    objections?

6    MR. CARLTON:  With regard to the minor role, we did file the

7    memorandum.  We believe that there are two cases from the 11th

8    Circuit, Rodriguez De Varon, 175 Fed. 3rd 930, an 11th Circuit

9    decision from 1999, and United States versus Zaccardi, 924 Fed. 2nd

10   201, an 11th Circuit decision from 1991.  The problem legally with

11   the argument -- with the defense argument is that the defendant was

12   already given a benefit with regard to the relevant conduct.  He

13   was only held accountable for approximately -- I think it's 85

14   million, the conduct, the fraud that occurred after he discovered

15   in March of 2004 that KL was a house of cards based on fraud and

16   stayed until the end of the collapse of that Ponzi scheme.  Because

17   he has already received the benefit of that and has not been held

18   accountable for the totality of the fraud, the Government believes

19   that the case law of De Varon and Zaccardi, that merely because he

20   might be less culpable does not entitle him to a minor role

21   adjustment.  We believe that, frankly, the law is just not on his

22   side in that.  We'd rest on those authorities.

23   With regard to the criminal history calculation, if you look --

24   The Court certainly has discretion to depart in this case under the

25   advisory guidelines.  We would agree that a review of Yung Bae

1   Kim's life indicates that other than what was in the past a

2   drinking problem, he's never really had any contact with the

3   criminal justice system.  There was a case in Nevada that was

4   resolved with regard to a bad check.  But other than that, he's led

5   a fairly stellar life.  And if the Court were to consider a

6   departure down, we would suggest with regard to criminal history,

7   that would be a departure from criminal history category 2 down to

8   1.  The prior DUI is the only real scoreable offense that he had in

9   this case.  And that is somewhat to be contrasted with other cases

10  that your Honor and myself see in which there are defendants who

11  have numerous arrests scoreable or not throughout their presentence

12  report that are noted.  This defendant does not have that.  And so

13  I think the argument certainly was made in good faith, and the

14  Court has discretion to provide a break if it is so inclined.

15  And I'll comment on the 5(K) motion at a later point in the

16  hearing.

17  THE COURT:  I'll deny the motion on the minor role.  And I will

18  depart to the criminal history 1 instead of 2.  Now I'll hear from

19  the Government on their 5(K)1.1 motion.

20  MR. CARLTON:  Thank you, your Honor.  With regard to the

21  substantial assistance, we did previously file a motion for the

22  Court to depart below the otherwise applicable advisory guideline

23  range.  We believe that that range now should be level 35 -- I

24  misspoke.  A level 34 which is a 151 from 188.  There are a few

25  things that the Court needs to know about this case from the

1    Government's perspective before it reaches the decision on whether

2    to grant the Government's motion and in its decision on what

3    sentence to ultimately impose.

4    Mr. Smith earlier did mention that two persons in this case after

5    the SEC appeared at the Offices of KL Financial both in West Palm

6    Beach and Urbine, California, disappeared.  Those two persons were

7    Juan Lee and Yung Kim.  Mr. Kim, shortly before --

8    Well, it's actually shortly after the case was indicted.  The

9    Government had begun to reach out to arrest Jon Kim and made

10   contact with the family of Yung Kim to convince him to surrender.

11   We didn't have an agreement worked out yet.  He was in the middle

12   of returning to the United States under the helpful wing of

13   Mr. Maloy when he was stopped at JFK Airport in New York in

14   January of 2007.  This case having been indicted under seal in

15   either late November of 2006 or early December 2006.  I forget

16   which it was.

17   But, nonetheless, immediately after arriving in South Florida, Yung

18   Kim began to cooperate across the board with the investigators and

19   the FBI and the United States Attorney's Office.  Those efforts in

20   cooperating are ongoing today.  It's important for the Court to

21   know that this was an extremely complicated case with regard to

22   unraveling a fairly tangled web of several years of daily

23   securities trading wherein multiple accounts by the perpetrators of

24   this fraud --

25   One of the things that made the case extremely difficult was that

1   although Jon Kim was the major trader for KL, he did not have a

2   securities license and, therefore, did not trade in accounts in his

3   own name.  He traded under the accounts of other persons who did

4   have a Series 7 License.  As a result of that, it was extremely

5   difficult for the Government to figure out which were the trades

6   that Jon Kim was actually performing on a daily basis for a period

7   of several years.  Yung Kim became the interpreter and key analyst

8   in looking over those trades.  In my discussions with the FBI

9   agents they have informed me that Yung Kim reviewed approximately

10  250,000 individual trades in an effort to unravel and figure out

11  the web of trading that Jon Kim had undertaken during the course of

12  the KL fraud.

13  FBI agents and forensic examiners from the U.S. Attorney's Office

14  as well as from the State of Florida met with Yung Kim at least 25

15  separate times and spent at least three or four hours, sometimes

16  six hours during those visits in an effort to assist the Government

17  in not only preparing the case for trial but unraveling the

18  complicated web of trades that had occurred.  In the opinions of

19  two senior FBI agents who combined have over 50 years of experience

20  in financial fraud cases, they separately and independently told me

21  that in their history of their careers, that this defendant had

22  spent more time with them providing assistance than any financial

23  case that they had ever worked.

24  And this was an extremely different case because the fraud in the

25  case was not just taking the money and running, but lying about the

1  trades, which was a very different type of fraud, much more

2  sophisticated and harder to figure out.  Yung Kim's decision in

3  this case to cooperate early was one he should be given credit

4  for.  It was against his older brother, an older brother whom the

5  Government after its multiple meetings with him and with Jon Kim

6  and as an objective review of the PSI, I think, indicates that this

7  defendant looked up to his older brother for a substantial amount

8  of his life, would not have gotten involved -- if you look at a

9  snapshot of his life, would not have gotten involved in this type

10 of conduct but for Jon Kim bringing him under his wing and getting

11 him involved in this.  He certainly should have left, but he did

12 not.

13 The assistance that was lent in this case, frankly, I think that

14 Jon Kim pled in large measure because he knew that he was going to

15 be sunk by Yung Kim unraveling everything.  Jon Kim was very smart

16 and kept his name off just about everything.  This younger brother

17 was left holding the bag with his name on accounts where Jon Kim

18 would direct Yung Kim to where to send the money.

19 Financial cases, as Mr. Maloy accurately pointed out, usually the

20 Government can figure out or an objective observer can figure out

21 who benefitted the most or who was pulling the strings when you

22 trace the money.  In this case the government traced around 13

23 million to Juan Lee, about 10 million to Jon Kim, and around

24 700,000 to this person, Yung Kim.  Yung Kim was not a partner.  He

25 did not mastermind the counterfeit documents, did not mastermind

1    the trades.  His cooperation, I think, is what leveraged Jon Kim's

2    pleas or his plea to the count.

3    The cooperation really caused -- of this defendant caused Jon Kim

4    to collapse.  I don't think it was Jon Kim.  He had his own factors

5    or own reasons for pleading, but I believe a large measure was his

6    knowledge that this defendant, his younger brother, was going to

7    testify against him and confront him in court and was going to

8    expose the house of cards that Jon Kim and Juan Lee had created.

9    We're recommending in the case, your Honor, a fairly significant

10   break for this defendant.  He's been in jail since approximately

11   January of '07.  We're recommending that the Court consider a

12   departure downward of approximately 40 percent of that.  I don't

13   say that lightly.  The cooperation with regard to the detailed

14   nature of it with regard to what the FBI agents were telling me was

15   kind of unprecedented with regard to the nature and quality and

16   quantity of the cooperation.  And I think that it's important that

17   a defendant who provides that type of information receive the

18   benefit of that and know that when the Government tells them 18

19   months before this day arrives that the prosecutor of the United

20   States Government will recognize their quality and quantity of

21   cooperation, that that means something.  And that's why we're

22   asking for 40 percent off.

23   THE COURT:  All right.

24   MR. MALOY:  Just so the Court knows, his mother and sister are

25   present in the court.  Actually, his sister wishes to briefly

1  address the Court.  And I don't know when the Court --

2  THE COURT:  Certainly.  I'll do it right at this time, if you'd

3  like.

4  MR. MALOY:  Jin.

5  THE COURT:  Just a minute.  Would you swear the witness, please.

6                      -   -   -

7  Thereupon,

8                      JIN LEE,

9  being by the court reporter first duly sworn, responded as follows:

10 THE WITNESS:  I do.

11                     -   -   -

12 COURT REPORTER:  Would you please spell your first and last name

13 for the record.

14 MS. JIN LEE:  My name is spelled J I N, Jin Lee, L E E.

15 Your Honor, on behalf of my family, I would like to apologize to

16 you, to the investors, their family and friends and the employees

17 of the KL who have trusted my brothers and believed in them.  There

18 is no excuse what they have done to them and to themselves.  My

19 father passed away last year.  He was devastated when he found out

20 what had happened to my brothers, that they were in prison.  He was

21 ashamed and had felt guilty that he had not raised his sons

22 properly and that he decided he did not want to live any longer and

23 did not want any further treatments.  My mom is right now going

24 through a depression and anxiety attacks.

25 Your Honor, they are both my brothers.  But Yung is a very kind,

1  caring person.  And that he would never do anything to harm anybody

2  intentionally, and Yung is not a smooth talker like Jon is.  I have

3  seen from myself.

4  At first I thought that it was a small company that they have

5  started.  And, initially, in the beginning I had paid for Yung's

6  salary, my mom -- my parents owned a liquor store.  And I had paid

7  for some of the office expenses through my credit cards.  And the

8  supposedly card that Jon had bought for Yung that was he initially

9  put a small down payment on it so my mom had to pay for the card

10  using their home equity line.  I didn't realize how big the company

11  was until I had visited Jon in his mansion in Florida.  I had seen

12  how Yung had lived.  There was only couple of beers and water in

13  his refrigerator whereas Jon had three or four refrigerators full

14  of food.  Yung had -- Yung was living with so much old furnitures

15  Jon had brought from California.  I don't want to make any excuses

16  what both my brothers have done.  All I ask is that Yung be able to

17  serve his time in a safe environment and be able to come back to us

18  safely.  Thank you.

19  THE COURT:  Thank you.

20  MR. MALOY:  May I, your Honor?

21  THE COURT:  You may.

22  MR. MALOY:  I guess, your Honor, a follow-up with that, and

23  follow-up with Ms. Lee's testimony, I think the Court needs to be

24  aware of the fact that when Jon was being sentenced today, there

25  was some argument that, you know, small investors were not involved

1   or the average every day folks were not involved, that these were

2   large investors with large amounts of money and, therefore, somehow

3   or another minimizes the victim or loss in this case.

4   I'd be remiss without really letting the Court know that this

5   family has gone through a tremendous amount of pain and suffering

6   as a result of this case, not the least of which is the financial.

7   As Jin just advised the Court, what's missing in these

8   million-dollar investments is the emotional loss and the financial

9   loss to the family.  The financial loss is such that that family,

10  who has no more money left, have invested repeatedly on the lure of

11  their son, Jon.  So much so, quite frankly, Judge, it never ceased

12  to reveal itself in my involvement with this case.  Not only did

13  they just take their hard-earned money and send it to Jon and it

14  got spent wherever Jon and Juan wanted to spend it, not invest it,

15  but again they believed -- and we're talking large sums of money

16  for these people, hundreds of thousand of dollars.  But as

17  indicated, he was a salary employee.  So somewhere along the line

18  there was an offer that he would get a perk of a car, and they gave

19  him a car.  But over a short period of time, the mother is paying

20  for the car.

21  We also learned while this was occurring -- I should say while this

22  was occurring post-indictment, that Jon had taken out credit cards

23  in his parents' names unbeknownst to them.  And now that Jon was in

24  jail, the credit card companies were coming to the family during

25  the time period when they are financially depleted because of his

1   actions.  And they are not sophisticated people in the world of

2   finances.  They are Korean immigrants who came to this country, who

3   literally worked 14, 16 hour days to save money to get a house, not

4   a million-dollar house, but a house.  So when these credit card

5   companies came to them, they felt they needed to pay the debt of 50

6   to $60,000 in addition to hundreds of thousands that they had

7   already just given away.  And this was a pattern that had developed

8   through, quite frankly, most of Jon's adult life.  What happened,

9   you send us money; I have a good idea for an investment for you.

10  And that money is gone.  Fortunately, the credit card companies

11  eventually understood the situation and backed away.

12  But that is kind of just a symbol of what this family has

13  suffered.  And I say that.  The emotional part of it is Yung.  For

14  reasons I have never really understood, the family has been -- I

15  guess I'm looking for the right word, Judge, but almost like a

16  spindale like influence Jon has had on the family.  I mean, when

17  you look at the scenario, it wasn't like they gave him money one

18  time and then found out he just spent it and then said never again

19  as we would do, say, to my son or daughter or brother or sister.

20  And it happened again, and it happened again, and it happened with

21  the car, and it happened again.

22  In Yung's life it happened in financial purposes, and just overall

23  the way he led his life.  I think there's a reference in the

24  presentence report and several years ago when he was working with

25  Jon, long before this event, he landed up suicidal in a Fairfax

1    hospital.  The relationship at times was almost more like a

2    battered-spouse scenario.  Sometimes it was physically abusive.

3    Sometimes it was mentally abusive.  And here he comes back again

4    for reasons just like the family comes back with money and says,

5    Okay, Jon, Okay, Jon, and we give you more money.  And, Okay, Jon,

6    here's some credit cards, and they come back.  And Yung comes

7    back.  And what Yung does wrong -- and I guess, to back up again,

8    is I don't want to under any circumstances let the Court think that

9    they have abandoned Jon, even now.  It's very difficult for them

10   not to come forward on behalf of Jon now.  There have been

11   references, frankly, that the family has said to me in the past

12   several weeks which I find still disturbing, and I have had to calm

13   them down.  They are here -- even now, they are not saying, you

14   know, they are not up here presenting me victims to Jon.  They are

15   emotionally torn even to Jon to this day, and so is Yung.  But what

16   they are saying is they know Yung.  They are in some ways guilty

17   that they have allowed this thing to develop to the point where he

18   sits here.  He sits in a Federal prison -- or excuse me.  He sits

19   on a Federal indictment in prison.  And he got to that point for

20   reasons unbeknownst to me.

21   But when he gets to that point where he finally realized a fraud

22   was occurring, they will tell you -- I think the Government will

23   tell you, knowing him as well as I know him now, that he's the guy

24   who is going to do the right thing.  He's the guy that will never

25   commit a crime.  Unfortunately, when it opened up in front of him,

1   that there was a fraud going on, he had that choice to do the right

2   or wrong thing, and he did the wrong thing.  That's what he did.

3   He decided for whatever reason he thought this thing could get

4   cured.  And two employees have been hired at his recommendation.

5   He felt somewhat obligated to them, making all the wrong decisions

6   in the bubble of what was going on when this matter began to

7   collapse.

8   He then goes off with Juan Lee and eventually ends up in Korea

9   preindictment.  But certainly everybody knows at this point in time

10  the SEC is involved, and the end is near.  I will tell the Court

11  again that the kind of person that he is that when he's in Korea

12  and the indictment comes in, he does the right thing.  He's going

13  to come back.  But he has another suicide attempt.  This is not a

14  fella who is out there converting large sums of money and spending

15  the spoils of his crime.  He's never had the country clubs.  He

16  never had the million-dollar house.  He never had the Porsche.  He

17  had a car that his mother was paying on the credit card.  That's

18  what he had.  And at one point, your Honor, when he left to go to

19  Korea he was, I think, 330, 340 pounds.  The whole anxiety, the

20  whole guilt, everything that went with his involvement in this case

21  caused him to lose literally almost 200 pounds by the time he came

22  back.  He couldn't eat.  He didn't have much money over there to

23  begin with and became suicidal again.  He had to admit himself

24  under a false name in the hospital in Korea.  So I have been unable

25  to get those records.  He comes back, your Honor, after he contacts

Page 44

1  several counsel and, as the Government indicates, cooperates

2  immediately.

3  Literally, at the doorstep, he's coming in.  He knows he has to

4  come in.  He's not avoiding in any manner whatsoever.

5  And it began when he was up in the detention center in Brooklyn,

6  continued his estimate on the number of hours that he did down here

7  which he was certainly higher than the Government, but we're not

8  going to excuse that.  But we both agree:  It's literally hundreds

9  of hours.  And I was here for about four or five of those

10  sessions.  And it was oftentimes that as complex as this case is

11  and you can understand how complex the case is, there are times

12  that Yung would advise the Government and say, No, no, I think

13  you've got it wrong.  He had to unravel it for them.

14  And, really, as it came to Jon, there was a time when I was present

15  when he said, I can look at the trading sheets, and I can tell you

16  which ones are Jon's.  And as the Government told you, that's

17  250,000 trading sheets he went through, to go against a brother

18  that, quite frankly, to this day, I'm not sure that he's still been

19  released from his control.  But he's doing now what we always

20  thought that Yung would do, and that is the right thing.  When the

21  decision came, he did the right thing.  And he sat down, and he

22  went through all those documents and all those trading sheets.  And

23  he -- and Jon indicates that his sentencing -- and the Court

24  correctly gave him benefit for saving the Government time and money

25  in a trial.

1  But I would echo the sentiments of Mr. Carlton which is, it is Yung

2  Kim who saved the Government and this Court a lot of money and a

3  lot of time, because it was only when Jon realized that he, his

4  brother, was going through those trades sheets that he, Jon, whose

5  name was not on these documents, that his day was coming near the

6  end.  And it was his cooperation, that extraordinary cooperation,

7  that really saved the Government a tremendous amount of time,

8  effort and money.

9  Mr. Kim would like to address the Court, your Honor.  And one of

10 the things lastly that he wishes -- I should say on his behalf,

11 he's compelled to speak to the Court, but he has a stutter.  And I

12 have told him, certainly, that the Court will certainly give him

13 all the time necessary to address the Court.

14 THE COURT:  Certainly.

15 MR. MALOY:  Yung.

16 MR. YUNG BAE KIM:  Your Honor, right now I'd like to say I'm deeply

17 sorry for what I've done.  I can't imagine the pain that I caused.

18 I was never malicious.  I thought I was doing the right thing to

19 try to help people, but instead I hurt more.  Right now it's just

20 it pains me so much that I hurt my parents, my sister and everyone

21 else because that's not me.  I try to do the right thing all the

22 time because my parents, they taught me to be a righteous person.

23 They taught me the morals, and I totally betrayed them.  There's

24 nothing I can say or do to make amends for what I've done.  But I'd

25 just like to say I'm sorry and just ask for forgiveness.

1  THE COURT:  Thank you.

2  MR. MALOY:  I don't know if I mentioned it, your Honor, but his

3  father passed since he was incarcerated.   He never really had the

4  opportunity to come down and see Yung since his incarceration.   I

5  have nothing further, your Honor.   Thank you.

6  THE COURT:  Anything further from the Government?

7  MR. CARLTON:  No, your Honor.

8  THE COURT:  Let me ask you a question, Mr. Carlton.  As the

9  Government knows, whenever a 5(K)1.1 is filed, I generally give

10  one-third off unless there are extraordinary circumstances.  And

11  you felt that this was a rather extraordinary case.  You're giving

12  him another, basically, 7 percent off for what seems to be a rather

13  extraordinary cooperation.  You still feel that 40 percent off is

14  the maximum the Government can recommend?

15  MR. CARLTON:  Well, whatever the Government recommends doesn't bind

16  the Court.  I've advised you what our recommendation is.  He has

17  waived appeal in this case.  The cooperation is significant.  Your

18  Honor has discretion to depart and impose a sentence at whatever

19  your Honor thinks is appropriate.  And certainly we would look at

20  that.

21  THE COURT:  The point is that the Court does not have the same

22  knowledge as to the difficulty in proving the case and the

23  cooperation that was given.  And so the Court relies heavily upon

24  the Government because you have all these facts and I don't.

25  MR. CARLTON:  I will tell you -- I'll honestly advise the Court

1    that a significant factor of Yung Kim's cooperation was unraveling

2    the trades that would have nailed Jon Kim because Jon Kim's name

3    was on nothing.  And that was the malevolent nature of his

4    involvement in orchestrating $194 million fraud.  His younger

5    brother held the key, the rosetta stone, that unraveled all of that

6    and allowed a significant savings of judicial time and economy.

7    The Court is entirely appropriate in factoring that into what would

8    be an appropriate sentence in this case.  The cooperation was not

9    just that one time in unraveling it.  He looked at approximately

10   250,000 trades.  It was real significant.  I asked for a specific

11   authorization on 40 percent.  That's what they gave me.  That

12   doesn't bind the Court, however.

13   THE COURT:  All right.  Court has considered the statements of all

14   parties, the presentence report which contains the advisory

15   guidelines and the statutory factors.  Based upon the severity of

16   the offense and the Government's 5(K)1.1 motion, the Court will

17   impose a sentence outside of the advisory guideline range.  It is

18   the finding of the Court that the defendant is not able to pay a

19   fine as well as restitution.  It is the judgment of the Court that

20   the defendant, Yung Bae Kim, is committed to the Bureau of Prisons

21   to be imprisoned for a period of 75 months.  This term consists of

22   terms of 60 months as to Count 1 and 75 months as to Count 8, both

23   counts to be served concurrently.  It is further ordered defendant

24   shall pay restitution in the amount of $78,525,567.34 joint and the

25   several with all codefendants.  During the period of incarceration,

1    payment shall be made as follows:

2    If defendants earns wages in the federal prison Unicorp job -- are

3    we going to do all of this through the receiver, even through the

4    prison?  But he still has to contribute these amounts to the

5    receiver, right, not to the Government; is that what we have in

6    mind?

7    MR. CARLTON:  Yes.

8    THE COURT:  Well, he will pay to the receiver.  The restitution is

9    $78,525,567.34.  And if he earns -- has a Unicorp job, 50 percent

10   of the wages earned shall be paid over to the receiver.  And if he

11   does not have a Unicorp job, 25 dollars per quarter towards the

12   financial obligation to the receiver.  And upon release from

13   incarceration defendant shall pay restitution at 10 percent of

14   monthly gross earnings through the receiver.  Upon release from

15   imprisonment, defendant shall be placed on supervised release for a

16   term of three years.  This term consists of three years as to

17   Counts 1 and 8, both terms to run concurrently.  Within 72 hours of

18   release from the custody of the Bureau of Prisons defendant shall

19   report in person to the probation office in the district to which

20   the defendant is released.

21   While on supervised release the defendant shall not commit any

22   crimes, shall be prohibited from possessing a firearm or other

23   dangerous device, shall not possess a controlled substance, and

24   shall comply with the standard conditions of supervised release,

25   including the following special conditions:

Page 49

1  Defendant shall participate in an approved treatment program for

2  mental health and/or substance abuse and abide by all supplemental

3  conditions of treatment.  Participation may include inpatient

4  and/or outpatient treatment.  The defendant will contribute to the

5  costs of services rendered based upon ability to pay or

6  availability of third-party payment.  Defendant shall cooperate

7  fully with the Internal Revenue Service in determining and paying

8  any tax liabilities.  Defendant shall provide to the Internal

9  Revenue Service all requested documents and information for

10 purposes of any civil audits, examinations, collections or other

11 proceedings.

12 Further ordered, defendant shall file accurate income tax returns

13 and pay all taxes, interest and penalties due and owing by him to

14 the Internal Revenue Service.

15 Defendant shall not apply for, solicit or incur any further debt

16 included but not limited to loans, lines of credit or credit card

17 charges either as a principal or as a cosigner and as an individual

18 or through any corporate entity without first obtaining written

19 permission from the Court.

20 Defendant shall obtain prior written approval from the Court before

21 entering into any self-employment.

22 Defendant shall not own, operate, act as a consultant, be employed

23 in or participate in any manner in any securities business during

24 the period of the supervision.

25 Defendant shall submit to a search of his person or property

Page 50

1   conducted in a reasonable manner and at reasonable times by the

2   probation officer.

3   Defendant shall immediately pay to the United States a special

4   assessment of $100 as to each of Counts 1 and 8 for a total of

5   $200.  Now that sentence has been imposed, does defendant or his

6   counsel object to the Court's finding of fact or the manner in

7   which the sentence was pronounced?

8   MR. MALOY:  No, sir.

9   THE COURT:  Do you understand you have a right to appeal the

10  sentence and any notice of appeal must be filed within 10 days

11  after the entry of judgment being entered in this case?  If you are

12  unable to pay the costs of an appeal, you may apply for leave to

13  appeal without payment of costs.  Do you understand that?

14  YUNG BAE KIM:  Yes, your Honor.

15  MR. MALOY:  He's also asked if he could be recommended either to

16  Eglin or Pennsacola.

17  THE COURT:  I'll make those recommendations.  And you wanted a

18  500-hour drug treatment program?

19  MR. MALOY:  Yes, sir.

20  THE COURT:  I'll recommend that.  Anything further?

21  MR. CARLTON:  No, your Honor.

22  THE COURT:  All right.  Court will be in recess.

23  (The proceedings were adjourned at 4:34 p.m.)

24

25

```
 1                    C E R T I F I C A T E

 2                         -   -   -

 3

 4    STATE OF FLORIDA

 5    COUNTY OF PALM BEACH

 6

 7

 8         I, Mary R. Desiderio, Registered Professional Reporter, do

 9    hereby certify that I was authorized to and did stenographically

10    report the foregoing proceedings and that the transcript is a true

11    and correct transcription of my stenotype notes of the proceedings.

12

13    Dated this 24th day of April, 2009.

14

15

16                      S/ MARY DESIDERIO

17                      Mary R. Desiderio

18                      Registered Professional Reporter

19

20

21
      The forgoing certification of this transcript does not apply to any
22    reproduction of the same by any means unless under the direct
      control and/or direction of the certifying reporter.
23

24

25
```